The final case in our call today is agenda number 15 106 260 Outcom Inc. v. Department of Transportation et al. Good morning, Your Honors. May it please the Court. My name is Brett Legner. I am an Assistant Illinois Attorney General, and I represent the defendant's appellants in this matter. Your Honors, this Court should reverse the decision of the Appellate Court and reverse the judgment of the Circuit Court and hold that the final administrative decision of the Illinois Department of Transportation denying up-to-date outcomes, applications for permits to build highway-side billboards was not clearly erroneous and, in fact, was correct. Your Honors, simply put, Outcom did not establish that under State law that the local zoning authorities considered the use of a, the presence of a radio transmitter and attendant equipment shed on this particular parcel to be a sufficiently intensive commercial or industrial use of the land sufficient to constitute a business area within the meaning of the Illinois Highway Advertising Control Act of 1971. The first point, Your Honors, to bear in mind is that Outcom bore the burden of proof in this case. After the conclusion of the administrative proceedings, Outcom filed a complaint seeking declaratory, a declaratory judgment and mandamus relief in the Circuit Court. To be entitled to mandamus, it is clear that Outcom bore the burden of establishing a clear right to the performance of a ministerial act by a public official. Outcom thus bore the burden of proving that it had a clear right to the issuance of the billboard permits that it sought. Additionally, under the Illinois Highway Advertising Control Act of 1971, Outcom bore the burden of proving that the proposed site was considered to be a business area within the meaning of the act. Well, there's some arguments that you make for us that were not raised during the administrative hearing. I don't believe so, Your Honor. I believe that everything is, everything the Department raises is an expansion of and consistent with its administrative decisions. Its administrative decisions specifically found, for instance, that Outcom did not prove that the local zoning authorities treated this as a commercial or industrial use of the land. If we find that there were arguments raised that were not raised, rather, would they be procedurally defaulted here? I don't believe so, Your Honor. The first point is that Either way, you're okay. Either way, we're okay. Raised or not raised, it doesn't matter. It's not defaulted. Raised or not raised, it's not defaulted in this instance. In this instance where they were strictly, you know, requiring the record of the administrative agency to be brought before the court, in effect, this is an administrative review act. They didn't style it like that. They sought separate relief. They bore the burden then of proving to the court that they were entitled to these permits. Additionally, and again, I want to reiterate that all the Department's arguments that's made before this Court are consistent with what its position was before the, before the with its position during the administrative proceedings, and in any case, ultimately, you know, of course, forfeiture would be a limitation on the parties, and certainly it would be within this Court's province to consider any arguments that have been fully discussed. Not only does outcome bear the burden of proof in this case, it's important to remember that at base, outcome seeks review of a final administrative decision. The General Assembly made a legislative decision that the determination of whether a party is to be entitled to a permit to build a billboard along the side of an interstate highway is to be made in the first instance by the Illinois Department of Transportation. That determination is entitled to deference. The General Assembly created a system where these decisions go not into the circuit court in the first instance, where these decisions go before the agency. In resolving outcomes permit applications, the Department in this case considered the facts that outcome presented to it, and applied those facts to see if they met the standard of law, in other words, the statutory definition of a business area. That's basically the exact definition of a mixed question of law and fact that is subject to a clearly erroneous standard of review. And in any case, the Department is empowered to enforce and interpret the act, and its interpretation is entitled to deference in any case from this Court. The next point, Your Honors, is that to fully understand the issues presented in this appeal and the Department's position, it is necessary to understand the statutory scheme underlying highway billboard control. And it's sort of a two-part statutory scheme, relying on a federal scheme and a state scheme that was implemented in response to the federal scheme. Under President Eisenhower, the interstate highway system as we know it came to be. What also came to be was public concern in opposition to the proliferation of billboards along the side of the interstate highways. The highways became inundated with billboard advertising, and this raised the public's ire sufficiently for the federal government to take action. The billboards were a blight on the landscape and posed threats to the safety of the motorists because they were distracting, and they actually placed physical obstacles near the side of the highways that were dangerous in case of collision, something along those lines. Therefore, in 1958, the federal government passed the Federal Aid Highway Act, also known as the Bonus Act. Under that statute, the federal government was allowed to enter into agreements with states. And pursuant to the terms, if the states would agree to maintain effective control over highway advertising, meaning basically to limit it to areas that were commercial or industrial, either zoned as commercial or industrial or if unzoned, if the customary use of those areas was commercial or industrial, as of September 21, 1959, a contemporaneous date with the passage of the Federal Aid Highway Act of 1958, the states could receive a bonus payment. In other words, if the state effectively maintained control of billboards on a stretch of interstate highway, then the state would receive a bonus one-half of one percent funding for any projects on the applicable portion of the highway. By 1965, Illinois had entered into a bonus agreement with the federal government. After the Bonus Act expired by its terms, Lady Bird Johnson spearheaded the passage of the next federal statute that had a different focus. Instead of giving the states the caret of agree to control highway billboards and limit them, and we'll give you this bonus, the state, the federal government provided in the Highway Beautification Act of 1965 that if you don't enter into an agreement with us in which you maintain effective control over highway billboards, limiting those billboards to commercial areas or industrial areas, you will lose ten percent of your federal funding. And in fact, the federal government implemented them the stick. Not just that if the states enter into agreement to limit billboards, you get a bonus. Here, if you don't enter into an agreement to limit billboards, you lose ten percent of your federal funds. As a result of these acts, not only were billboards along Interstate Highway limited, but non-compliant billboards were removed by the score. In other words, billboards that had been placed in areas that were not commercial or industrial or where the customer use was not commercial or industrial had to be removed. And the statute made provisions for the payment and, you know, who bears the expense of removing those billboards and many billboards were removed under those acts. To comply with the federal laws and the agreements that Illinois entered into with the federal government in order to obtain bonus payments and to ensure that it did not lose ten percent of its highway funding, the General Assembly passed the Highway Advertising Control Act of 1971. That act and its proper enforcement is Illinois' method of maintaining the effective control of highway advertising required under the Bonus Act, the Beautification Act, and the agreements the state has with the federal government. It is thus necessary for Illinois to follow and enforce this act in order to receive its bonus and keep its bonus payments as well as to not lose ten percent of its federal highway funding. And incidentally, annual federal highway funding easily runs into the hundreds of millions of dollars, you know, and that's annually. And certainly the state's fiscal situation is no secret and that the loss of those funds impose obviously a huge burden on the state. To effectuate its duties under the federal agreements and acts, Illinois provided that billboards along interstate highway, the interstate highway right-of-way are prohibited except in certain circumstances. The expressed purpose of the Illinois Act is to protect the public investment of the highways, to promote the recreational value of travel, to preserve natural beauty, and to promote the orderly display of billboards. These are the legislative judgments that went into the passage of the Illinois Act. And certainly the statutory exceptions to the general rule that highway side billboards are prohibited must be construed narrowly because they are exceptions that must not be allowed to swallow the rule and because Illinois has contractual obligations with a lot of money at stake requiring it to limit billboards, to maintain effective control of highway side billboards, to limit those billboards to commercial or industrial areas. Now in this particular case, outcomes sought refusion section 4.04 of the Illinois Act, which permits billboards in business areas. It's the business area exception to the general rule that highway side billboards are not permitted. Section 3.12 of the Illinois Act defines business areas as including only areas incorporated and zoned commercial or industrial as of September 21st, 1959, which is not applicable in this case. That part of it, that definition is not applicable in this case because there's no dispute that the proposed site here, the parcel right issue, was not incorporated or zoned at that date. It was annexed to the village of Caseyville about five years ago in fact. So as of 1959, this was unincorporated and non-zoned property. Or, and this is the second part of the 3.12 definition, or to areas where the interstate highway traverses where the land use as of 1959 was established by state law as industrial or commercial or both. So in other words, to show that there was a business area, outcome needed to prove that the land use, going back now 50 years, was established under state law to be commercial or industrial. The customary use under state law was commercial or industrial. This definition requiring the customary use of the area to be a business area is backed by the rationale that in an area marked by a commercial or industrial use, there is no expectation of an uninterrupted vista. Essentially, an intensive commercial or industrial use would destroy any expectation that a driver on the interstate highway has of being able to see, you know, the Illinois natural beauty. Because if there's a Walmart there or if there's a factory there, there's smokestacks, there's customers coming in and out, you know, there's cars, there's trucks unloading, etc. One would not necessarily expect that area to be free of billboard advertising. Section 3.10 of the Act defines commercial or industrial activities. Recall 3.12 says a business area is an area marked by commercial or industrial land use. Commercial or industrial activities under the Act are those activities generally recognized as commercial or industrial by zoning authorities of the state. Is it necessary in this case, counsel, for this court to interpret what it means, what business area means? I don't believe so, Your Honor. I believe that in terms of engaging in statutory construction, I believe that it's an unambiguous phrase. I believe that it's clearly defined in the statute and that this court need not engage in statutory construction aides to interpret it. Now, there's still an issue of whether the facts meet the statutory standard of business area. So in that regard, there's an analysis as to whether there is a business area here. But as to what is a business area within the meaning of the statute, I don't think that that's an unambiguous, I don't think, I'm sure, question. So then it's not a question of law, it's really a mixed question and whether the facts fit into this? That's correct, Your Honor. That's exactly right. Is there a difference in the definition of business area under the statute than there is under the regulations? No, Your Honor, is the short answer to that. And no, because there cannot be. Outcome makes a lot of the fact that in the department's regulations, it defines a business area as an area where the land use was business, commercial, or industrial, as opposed to just commercial or industrial as provided in the specific act. It is our position that the addition of the word business in the department's regulation has no substantive effect. If anything, that's a recognition that different zoning authorities, different local authorities don't use a set or standardized list of terms to describe business or commercial or industrial activities. What might be a commercial C1 zone in Caseyville might be a business, you know, B2 zone in Skokie. But they're the same thing. They're meant to be synonyms. And in any case, the law is clear that the department's regulations cannot expand the scope of the statute. So even if the addition of the word business did add something substantively, theoretically add something, it can't. The regulations cannot enlarge the scope of the General Assembly's act. Is there a standard review in this case? Excuse me, Your Honor. The standard review, Your Honor, is the clearly erroneous standard. Applied to the agency or to the court? Applied to the agency. Because at base, that's what is before the court. So there were arguments that the agency make here, or rather that the state makes here, that were not made before the agency, and we should disregard those arguments? Are they procedurally defaulted, waived, as I asked before? I disagree, Your Honor. First, the agency was the decision maker before. It wasn't necessarily making arguments. It wasn't a party in that case. The agency sat and determined whether outcome met its burden. And the department's decision was that outcome did not prove that local zoning authorities treated the land as commercial or industrial. But the arguments made by the state were not the basis, then, of the agency's ruling. I disagree. If you look at pages A12 and A13 of the appendix, which is the final administrative decision, the appendix to the department's opening brief, it specifically says that outcome did not establish that the radio transmitter equipment shed were considered to be a commercial or industrial use by the local zoning authorities, that, in fact, the local zoning authority considered it to be an agricultural use. And that is basically what the department's argument is here, that outcome has not shown, provided any source of state law indicating that this radio transmitter was a commercial or industrial use. It has not shown any zoning treatment as required by the Act that this was a commercial or industrial use. That was the basis of the holding that's explicitly stated in the department's decision, and that's the basis for the primary argument by the department here before this Court. That outcome has not met its burden of proof. Outcome has not shown any state law characterization of this tower use as commercial or industrial, and the proper state law... Any state law has been shown that would justify the definition as defined by the agency? Excuse me, Your Honor? Is there any state law that would substantiate the definition as found by the agency? The state law referred to in sections 3.10 and 3.12 is the treatment by local zoning authorities. They explicitly refer to a commercial or industrial activity as recognized by zoning authorities. So the appropriate law under the state is the treatment of the local zoning authority of a radio tower in this case, and that's the Caseyville Zoning Code, which was specifically referenced in the department's final administrative decision, and which specifically characterizes a radio tower as an agricultural use of the land. And again... When you just talk about the agency's decision, that's the October 5, 2004 denial letter, is that correct? That is correct. That is the final decision. And that decision specifically says the actual presence of the tower does not satisfy the requirements of section 522.20 of the code, and then it underlines that this was and has continuously been used as business, commercial, or industrial. So the administrative agency is making a finding that it's not a business use, but then goes on in the second to the last paragraph to talk about the building and the permanency, and then it says it's not used as an industrial site. So we're called upon to review this decision, which in some parts says it's not business, and some parts says it's not industrial, it seems to me. Would you clarify that for me, please? Certainly, Your Honor. This decision is made, and I'll first call your attention to the previous page, so it's page C52 of the record, page 1 of the October 5 decision, A12 of the appendix of our brief, that provides that prior to the annexation, the land use of the radio tower located on the property. That refers to the department's finding of how the local state law considered the use of the property, how it defined the use of the property made by the radio tower. It goes on to say that it has not, it then goes on to say that the actual presence of the tower itself has not satisfied the requirement that it be a commercial or industrial or business use. Okay. It then goes on to specifically discuss the presence of the equipment shed. Justice Cormier, was your question answered? I was just getting to the second part of the question, Your Honor, which was that the reference you made to the next page concerning the permanency of the shed, basically the department is holding there that the shed itself does not transform this into a commercial or industrial use. Perhaps the department uses only industrial site there, but its earlier reference shows that it's considering whether the outcome proved that this was a commercial or industrial site, and that's the decision before this Court. Thank you, Counselor. Thank you, Your Honors. Good afternoon. May it please the Court, my name is Jill Rambush, I represent Outcom in this case. And I'll try to pick off where my esteemed counsel has left off. I think the central point, there are several points of disagreement, but a big point of contention in this case has been whether Outcom was required to reduce evidence of zoning treatment in this case. And the argument is frequently centered on the definition of a business area. And I think the question directed to whether the department regulations and the code section 522.20, whether that definition is the same as the definition in the Act is an apt one. I think they are substantively similar, but I think that the change that the department made was a significant one. And I don't believe as the, I don't believe it substantially changed the scope or to either limit it or expand it, but I think that the changes that the department made to the code section are significant. The Act gave to the department the authority to enact regulations that were consistent with the Act. And if you look at the definition of business area within the code, one will see that the General Assembly defined business area to be areas zoned for business, commercial, or industrial activities. Then when it goes on to discuss business area along interstate highways, it references commercial or industrial activities. When the department enacted a definition for business area, it went back into the stream of words. And then when it expanded on the definition in 522.20 to discuss unincorporated areas, it repeated the word business for business, commercial, or industrial activities. Ms. Rumbush, is it your position that the controlling principles are found in the administrative regulation rather than the Act? No, I believe the controlling principles are in the Act and that the department, in enacting the regulation, carried them over. I believe that the code, I think the code has the force of law because regulations have the force of law. But I think that the department But they can't trump the statute. They cannot trump the statute, but I think it's consistent with the Act. I don't think it extends the scope or the reach of the Act, but I think it's entirely consistent with the Act. And I think the department has conceded this in its brief when saying that there's no substantive difference. So I think the department, in enacting the code, has set forth that a business area for an unincorporated area includes those areas in which a business, commercial, or industrial activity has taken place. But I think the department, of course, I can't step into the mind of the department in enacting these regulations, but in looking at it and trying to determine what they did, it appears that they've tried to set forth the intent of the General Assembly because the word business, commercial, or the string business, commercial, industrial activities appears in the Act. Would you at least agree that 3.12 of the Act is one of the key provisions? Oh, absolutely. Okay. And that refers to 3.10 of the Act? Yes, of course. And its requirement that commercial or industrial activities, quote, be recognized by zoning authorities in this state? Commercial industrial activities, yes. Okay. Yes. And there's no dispute that you would have the burden of proof on that? Before the administrative agency, absolutely. Okay. But that interplay of 1.2 and 1.0 did not impact your argument so far, is that right? That's correct. Okay. Okay. Counselor, if I may? Well, of course, you're the boss. Well, I may then. I'm concerned, in this case, with unintended consequences. You have made an argument in your brief, and the appellate court has agreed with you, that this piece of property is used as a business, commercial, or industrial piece of property which justifies the erection of billboards, correct? Yes. I'm wondering about other places that we're not thinking of. And if you just want to briefly address this, I would like that. I'm thinking of things like cable television, electrical lines, cell phone lines which are carried on telephone lines. In other words, other things that rest along the side of the highway that move the business product from some distant place along the highway to someplace else. And my question is, are there other areas, other factual areas like those that I've mentioned that may be impacted by the decision in this case? Well, knowing the creativity of lawyers, I'm sure there are innumerable areas that somebody might try to extend any particular holding to. With respect to the particular areas, particular types of activities you've cited, for example, electrical lines or telephone lines, I would equate those to more like a railroad line. And railroads have been specifically identified as something that is not a business activity. So in all candor, I would have to say that I would not include a utility line or something that runs along the highway. There's some suggestion that public utilities might not be included. And I'm not excluding it because it's a public utility. I'm excluding it because it runs along the highway. And I don't, I wouldn't expect that anything that runs along the highway for a long distance would be expected to be included because you could then erect something at every point along the highway. So it's not the nature of the activity. It's the location of the activity. So those sorts of activities that run along every square foot of the highway, I would I understand the basis of your argument is because they allow railroad lines to run along the highway? I think that's why. And you're making an analogy to the. Yes, because railroad, and I believe that's why railroad lines were excluded, is because they run along the highway and there was an intent to exclude things, railroads, because something could be erected along every square foot of the highway, not because the type of activity, because of the location. That's precisely what I'm concerned with. But radio does not suffer from that same defect. It has a fixed location. It doesn't have wires. It doesn't run along the highway. So I would distinguish a radio broadcasting tower, which has one fixed location, and it does not run for interminable miles along a highway. So with respect to those specific examples, I would distinguish it. Along that line, if we subscribe to your interpretation, in this case, is the area that's available for the advertising the area where the tower and the transmitter, whatever it is, stand, or is it the whole of the property? It's the location where the radio broadcasting tower and the structure next to it. It's not the entire 20-acre parcel. It's where those structure, where the tower and the structure are located. I'm sorry. And I don't remember where, but there's something about a distance being 660-some feet. That's the distance from the main traveled right-of-way, I believe. Or it could be the distance. There's two billboards. That could be the distance between the two billboards. There's two different sites. There's two billboards. And they have to be that far apart. I believe that might be how. There's one. It could be either of those. I don't know whether it's the two billboards that are two 650 feet apart or whether the 650 feet is how far the site has to be from the main traveled right-of-way. I apologize. I don't know that precise distance. Okay. If there are no more questions at this point, I'll continue on. The issue that is before this Court, as Your Honor has properly noted, is the propriety of the Department of Transportation's denial of the permit. And the issues that were set forth in this denial were whether radio broadcasting is a public utility. And that was the reason that was set forth, that it was a public utility. And implicit in that is that public utilities are not a business and that they cannot define the site on which they sit. Now, we believe that that analysis was wrong for all three reasons that were implicit in that analysis. First, radio broadcasting is not regulated in the State of Illinois as a public utility. Second, even if it is a public utility, it could still be a business. There is the State law in Illinois, the case law discussing this, recites that public utilities are businesses. I could probably consume the rest of my time listing the public utilities that are businesses. The two most prominent examples are AT&T and Ameren UE. They are both utilities. They are both businesses. Public utilities can be businesses. So the conclusion that the Department of Transportation reached that radio broadcasting is a utility and that it is not a business was an error. And finally, the notion that the radio broadcasting did not define the site on which it reached is simply illogical. Outcome was required to establish that this particular site had been used for a business purpose for the requisite period of time. It was undisputed that this site had been used for radio broadcasting for the requisite period of time. And the department concluded that, well, because this activity could have taken place somewhere else, because it can take place in more than one site, it didn't define this particular site. Well, that wasn't the standard. Outcome was required to establish the use of this site, and it did. And the department simply ignored that and concluded that, well, because it could have happened somewhere else, we're going to ignore that it took place here. And that conclusion was an error. Now, the department is now arguing that it denied the permits for a different reason. It's trying to suggest that it denied the permits because there was insufficient evidence of zoning. And I think they're trying to truncate their own denial letter. Their denial letter recites at the top of the second page that radio broadcasting is a public utility. It then discusses the structure. But the discussion of the failure to deduce zoning evidence is a conclusion reached, and it's a summary of their entire letter. It's not a separate conclusion. It's a summary. They conclude that radio broadcasting is a public utility, that public utilities don't define the land on which they sit, and that therefore the land never lost its agricultural character. The conclusion about lack of zoning is a corollary to their public utility argument. It's not a separate conclusion that they failed to deduce evidence of zoning. So they're truncating out that sentence as if the first part isn't there and treating it as if it's a second basis. It's all part of the same analysis. In the department, it's been a complaint that we set forth in our brief that the department throughout the life of this case has continually asserted new and additional bases that were not set forth in its notice of intent to deny and that were not set forth in its appeal, excuse me, in its denial letter. And there's yet a new argument in its reply brief, and it's an argument we've heard today on this argument. The notion that a use of property or that a commercial and industrial use of property has to be sufficiently invasive, that not just any commercial or industrial use of property, but an invasive use that would cause one to believe that it would interrupt the VISTA. And they signed a Missouri case for this proposition. And I looked at that case, and I don't think that's what it says, and I can't find any Missouri case actually that says that. But this case is about Illinois law. And the Illinois law defines what will and will not constitute a business, commercial, industrial use of property. And there's nothing in the Illinois law that talks about a use of property constituting a blight on the VISTA. It has to be visible from the roadway, and this tower is visible from the roadway. It's several hundred feet tall. There's a structure surrounded by fencing with high-voltage signs. But there's nothing that's talking about it having to constitute or take up a sufficient footprint on the land. And then the department goes on to talk about how it has to have shipping and receiving and people coming and going. And those requirements simply are not written into this law. And it's evidence of the department trying to rewrite and re-legislate as it goes. Not all businesses involve shipping and receiving. Most service industries don't. And not all industries involve, or not all businesses for that sake involve, people coming and going. Most mail order companies don't. But this is evidence of the department trying to recreate and add new requirements to the regulations that don't exist. If the legislature or the Department of Transportation, for that matter, wanted such limitations and regulations in its regulations or in its law, it would have put them there. The exclusions are that it has to be a permanent activity, it can't be a railroad, it can't be a farming activity, it can't take place in a residence, and it can't be a billboard. These other requirements that they're talking about simply aren't present. And in this argument that they're making, this highlights the danger of not requiring the department to comply with its own regulations. The notice of intent to deny that was issued in this case required, put outcome on notice that its permit was going to be denied because the structure was temporary. The regulations require the department to notify an applicant of each perceived deficiency, and the applicant is entitled to that notice. Now, they're given the opportunity to provide any evidence to respond to that perceived deficiency. If they don't, they proceed at their peril. But they're given the opportunity and the notice and the opportunity to be heard. And then the department is required to state in its denial each reason for its denial. That prevents surprise. It gives the applicant a notice and an opportunity to be heard. And I think most importantly is it prevents, it ensures fair and even-handed application of the regulations, but it puts the world on notice of how the department is interpreting and applying its regulations. And if we have these amorphous definitions and applications, we know about it, and we're not hearing about it at the Supreme Court. And in this case, that isn't what happened. They gave a notice of intent to deny stating that it was a temporary structure. And here we are, we're hearing these additional definitions. And outcome is being prejudiced in this case, because if the additional basis was that you don't have the sufficient evidence of how the zoning codes would treat this activity, it should have been in the notice of intent to deny. But it wasn't. And those codes are there for a reason. It's to give the applicant every opportunity to respond, because there is no appeal from a denial. The only appeal is a mandamus procedure. And when you permit the department to come into court and offer these new procedures, these new reasons, and these new bases, it denies the applicant the opportunity to respond, and it puts them in a position of being faulted for not offering evidence it didn't know it needed to provide. Now, I want to respond briefly with respect to the funding. We've received a primer on the Act, and we've heard suggestions that granting the permit in this case will result in the state of Illinois losing hundreds of millions of dollars in funding. In the 51 years since this Act has been passed, there's not been one reported case of any state losing its funding because federal authorities disagreed with the grant of a single billboard permit. And so the suggestion that it could come any day, I think, is rhetoric. These billboards have been up a couple years now. It hasn't happened. So the suggestion that that risk is there, I think, is overstated, to say the least. We've heard about the aesthetics of billboards and the presumption that billboards are a blight on the landscape. I'd like to read you something. Outdoor advertising is an integral part of the business and marketing function and an established segment of the national economy, which serves to promote and protect private investments in commerce and industry and should be allowed to operate in business areas. That's not from a trade journal. That is from the General Assembly in enacting this legislation. They recognize the importance of outdoor advertising in this state and Outcom was entitled to fair and even-handed enforcement of these regulations. The Department of Transportation should be held to the same standard as an applicant and should be required to have complied with its own regulations. And there's one question that hasn't been answered in all the briefing in this case, and I think it's one that the department cannot answer without admitting that to which it does not want to admit. They've told us what billboard advertising is not. Excuse me, they've told us what radio broadcasting is not, but they can't tell us what it is. If it's not business, commercial, or industrial activities, what is it? I don't think they can answer that question without answering that it is, in fact, business, commercial, or industrial activities. Outcom has established that this was a business area. They were entitled to the permit, and the judgment of the trial court and of the appellate court should be affirmed. Thank you. Thank you, Counsel. A couple quick points, Your Honor. The department doesn't have to tell you what radio broadcasting is. And, in fact, the issue isn't what is radio broadcasting. The issue is what type of use does a radio tower make of the land. And under the statute, under the Act, under 3.10, it's not the department that defines it. It is the local zoning authority. And the local zoning authority defined it in this case. It defined it to be an agricultural use of the land. The department's been answering that question constantly throughout its briefs, and, in fact, in its original decision when it said that prior to annexation, right, the use of the land was agricultural in nature with a radio tower on it. Caseyville defines, the local zoning authority, Caseyville, defines a radio tower to be a permitted use in an agricultural zone. It's not a commercial use. It's not an industrial use. It is an agricultural use within the specialized meaning of land use under the purposes of this statute. Section 3.10 specifically pegs the definition of a commercial and industrial activity on how it's recognized by the zoning authority. The zoning authority defines this particular use, radio tower, as agricultural. That is the answer. That is the simple answer and the easy answer to the question that counsel asked at the end. According to counsel, the central point is whether an outcome was required to reduce evidence of zoning treatment. The Act specifically requires it to. A business area requires proof of commercial or industrial activities under state law. Commercial or industrial activities are defined in the Act as those generally recognized by zoning authorities. That means that zoning authority, the treatment of local zoning authorities, is the relevant and dispositive factor in making the determination. And all along the department's explained that the local zoning authority, Caseyville, did not consider this radio tower to be an industrial or commercial use. Therefore, it did not consider this area to be a business area. It considered this area to be agricultural in nature. And that answers the question. They simply did not meet the clear burden, their clear mandate, under Sections 3.10 and 3.12 of the Act. The department certainly did not make a substantive change in what constitutes a business area when it enacted its regulations. But regardless of that, outcome still has to show that the use of the proposed site constitutes, you know, a commercial activity, industrial activity within the meaning of the code. And it simply does not do that. First, Caseyville, the zoning authority, considers it to be a business area. It does not consider it to be an agricultural use. Next, the local taxing authority assessed the area, the entire 20-acre farmland, as agricultural land. If this was a commercial or industrial part of that parcel, then the entire parcel could not have been assessed as agricultural. Furthermore, the argument, the notion that simply because a radio transmitter, a radio tower, is connected to a business, does not mean that the tower itself makes an industrial or commercial use of that land. Simply saying something is business connected does not mean it's a commercial or industrial activity according to the local zoning authorities. Indeed, outcomes argument makes no reference to the treatment of local zoning authorities or state law as required by 3.10 and 3.12. Furthermore, outcome entirely ignores the fact that the scope of the business area exception must be construed narrowly. First, it's an exception to a general rule that these highway signs are prohibited. Next, its expansive reading would dramatically increase the scope of that business area. If anything that was connected to a business on a piece of land constituted a business area, the permissible spaces, places under Illinois law, the permissible locations to put a billboard would be dramatically, would be geometrically increased. That certainly is inconsistent with the intent of the statute and which is consistent with the Missouri Appellate Court's decision in Osage 2, and it's inconsistent with the department's obligations and the state's obligations under its agreements with the federal government. And it is with regard to those agreements with the federal government that outcome declares the department's arguments to be rhetoric, saying, well, we haven't lost our funding, so we're in no danger. But outcome misses the point. The point is a dramatically expanded and loose definition of business area to encompass every piece of land in which something resides, which is somehow connected to a business, because that's their argument. That's their definition. It's somehow used in the stream of commerce and related to a business enterprise. If we expanded it like that much, then Illinois would likely no longer be seen to effectively control highway advertising, because Illinois has to limit it to areas that were either zoned commercial or industrial as of September 21, 1959, or which the customary use of the land as of that time was commercial or industrial. And if we consider anything to be somehow business-related to be commercial or industrial, then we've lost any real restriction on where highway billboards can be placed. And it's simply not unreasonable to think in that case then the federal government would initiate the proceedings, you know, initiate the process to pull funding or restrict funding or make us repay bonus money that we got for that given section of land. Your Honor, I asked a question about the 660 feet. Six hundred and sixty feet applies in this case because this act concerns billboards that are going to be within 660 feet of the interstate highway right-of-way. The spacing between the billboards along an interstate highway is limited by Section 6.03 of the act to be 500 feet. The billboards themselves have to be 500 feet apart. But the act applies to any billboard that would be within the edge of the right-of-way and 660 feet out. Again, Your Honors, and by way of conclusion, the Department in its decision specifically referenced the local zoning. And it was required. Outcome bore the burden of proving that it fell within the business area exception. To meet the business area exception, it had to show that there were commercial and industrial activities taking place on this land for the last 50 years. How do you show something is a commercial or industrial activity? You show how that activity is treated by zoning authorities. They made no such showing. To the contrary, the local zoning authority considered the radio tower and attendant equipment shed to be an agricultural use. That ends the inquiry. That was the nature of the Department's decision. That's at pages A-12 and A-13 of the appendix to the Department's brief. And that has been the Department's position all along. Their arguments notwithstanding, they did not meet the statutory requirements to show that they are entitled to the permits in this case. And what they asked this court to do is dramatically expand an exception to the general rule that highway billboards are not permitted. And that expansion will have profound effects not only on state funding, the funds the state gets from the federal government, but also on the experience of using our highways. Indeed, it was because of the inundation of the interstate highway system with billboards is why these laws were passed in the first place and scores of billboards were pulled down. What outcome asked you to do is to start to move back towards that inundation by an expansive definition of business area that's just inconsistent with the statutes. For these reasons, Your Honor, the Department urges this court to reverse the judgment of the circuit court and the decision of the appellate court and affirm its final administrative decision. Thank you very much for your consideration. Case number 106-260.